No. 13-3818

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

RAMON ALVARADO, et al.,
Plaintiffs-Appellants,

v.

CORPORATE CLEANING SERVICE, INC., et al.,
Defendants-Appellees.
_____

Appeal from the United States District Court for the
Northern District of Illinois, Honorable Edmond E. Chang
_____

**BRIEF FOR THE SECRETARY OF LABOR AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

M. PATRICIA SMITH
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

PAUL L. FRIEDEN
Counsel for Appellate Litigation

LAURA MOSKOWITZ
DEAN A. ROMHILT
Senior Attorneys

U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Room N-2716
Washington, D.C.  20210
(202) 693-5550

_____

_____

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................... ii

INTEREST OF THE SECRETARY...................................... 2

STATEMENT OF THE ISSUE........................................ 3

STATEMENT OF THE CASE......................................... 3

ARGUMENT..................................................... 11

    THE DISTRICT COURT ERRED BY CONCLUDING THAT CCS IS A
    RETAIL OR SERVICE ESTABLISHMENT BECAUSE CCS LACKS A RETAIL
    CONCEPT, DOES NOT SELL ITS SERVICES TO THE GENERAL PUBLIC,
    FAILED TO DEMONSTRATE THAT ITS SERVICES ARE RECOGNIZED AS
    RETAIL, AND SELLS ITS SERVICES FOR RESALE .................. 11

    1. The Building Maintenance Industry Has Historically
       Lacked a Retail Concept, and the Categorical Exclusion
       of this Industry from Having a Retail Concept Has Been
       Sanctioned by Congress................................... 12

    2. CCS Lacks a Fundamental Characteristic of a Retail or
       Service Establishment.................................... 21

    3. CCS Failed to Demonstrate That Its Sales Are Recognized
       as Retail Sales or Services in Its Particular Industry... 23

    4. CCS Sells Its Services for Resale, Precluding
       Application of Section 7(i)............................... 26

CONCLUSION................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM A — 29 U.S.C. 207(i)

ADDENDUM B — Excerpts from United States Department of Labor
           Interpretive Bulletin No. 6, "Retail and Service
           Establishments" (June 1941)

ADDENDUM C — U.S. Dep't of Labor, Wage and Hour Division, Field
           Operations Handbook, § 21ci00 (1990)

ADDENDUM D — U.S. Dep't of Labor Opinion Letter (July 2, 1992)

<u>TABLE OF AUTHORITIES</u>

Page

<u>Cases:</u>

*Arnold v. Ben Kanowsky, Inc.*,
     361 U.S. 388 (1960)............................... 2,4,16,25

*Gieg v. DDR, Inc.*,
     407 F.3d 1038 (9th Cir. 2005)........................... 5

*Goldberg v. Furman Beauty Supply, Inc.*,
     300 F.2d 16 (3d Cir. 1962)............................. 27

*Goldberg v. Kleban Eng'g Corp.*,
     303 F.2d 855 (5th Cir. 1962)........................ 27,28

*Gray v. Swanney-McDonald, Inc.*,
     436 F.2d 652 (9th Cir. 1971)........................ 26,28

*Hodgson v. ARA Servs., Inc.*,
     392 F. Supp. 1167 (W.D. Va. 1975)...................... 28

*Idaho Sheet Metal Works, Inc. v. Wirtz*,
     383 U.S. 190 (1966)........................... 16,17,18,21

*Jones v. Tucker Commc'n, Inc.*,
     No. 11-CV-398, 2013 WL 6072966 (M.D. Ga. Nov. 18, 2013).. 25

*Kirschbaum v. Walling*,
     316 U.S. 517 (1942)............................... 10,19,20

*Mitchell v. Kentucky Fin. Co.*,
     359 U.S. 290 (1959)................................. passim

*Mitchell v. Sherry Corine Corp.*,
     264 F.2d 831 (4th Cir. 1959).......................... 27

*Owopetu v. Nationwide CATV Auditing Servs., Inc.*, (Owopetu I)
     No. 10-CV-18, 2011 WL 883703 (D. Vt. Mar. 11, 2011)...... 25

*Owopetu v. Nationwide CATV Auditing Servs., Inc.*, (Owopetu II)
     No. 10-CV-18, 2011 WL 4433159 (D. Vt. Sept. 21, 2011).... 25

*Reich v. Delcorp, Inc.*,
     3 F.3d 1181 (8th Cir. 1993)........................... 5

Page

Cases (continued):

*Roland Elec. Co. v. Walling*,
    326 U.S. 657 (1946)..................................... 15

*Scantland v. Jeffry Knight, Inc.*,
    721 F.3d 1308 (11th Cir. 2013).......................... 2

*Scantland v. Jeffry Knight, Inc.*,
    No. 09-CV-1985, Dkt. No. 236 (M.D. Fla. Dec. 30, 2013).... 3

*Skidmore v. Swift*,
    323 U.S. 134 (1944)................................... 6,18

*Yi v. Sterling Collision Ctrs.*,
    480 F.3d 505 (7th Cir. 2007)............................ 4


Statutes:

Fair Labor Standards Act, 29 U.S.C. 201 *et seq.*,

    29 U.S.C. 204......................................... 2
    29 U.S.C. 207(i).................................. *passim*
    29 U.S.C. 208 (historical note)....................... 16
    29 U.S.C. 211(a)...................................... 2
    29 U.S.C. 213(a)(2) (repealed in 1989).............. passim
    29 U.S.C. 216(c)...................................... 2
    29 U.S.C. 217......................................... 2

Fair Labor Standards Act of 1938, Pub. L. No. 75-718,
    § 13(a), 52 Stat. 1060, 1067.......................... 12

Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393,
    § 11, 63 Stat. 910, 917............................... 5
    § 16(c), 63 Stat. 910, 920.......................... 14,18

Fair Labor Standards Amendments of 1961, Pub. L. No. 87-30,
    § 6(g), 75 Stat. 65, 70............................... 3

Fair Labor Standards Amendments of 1989, Pub. L. No. 101-157,
    § 3(c)(1), 103 Stat. 938, 939......................... 5

Page

Code of Federal Regulations:

 29 C.F.R. 779.0.......................................... 6
 29 C.F.R. 779.8....................................... 6,18
 29 C.F.R. 779.9.................................... 6,14,18
 29 C.F.R. 779.307........................................ 4
 29 C.F.R. 779.312...................................... 4,5
 29 C.F.R. 779.313..................................... 6,22
 29 C.F.R. 779.316.................................. 17,18,20
 29 C.F.R. 779.317............................... 10,11,18,19
 29 C.F.R. 779.318...................................... 25
 29 C.F.R. 779.318(a)............................... 9,10,21
 29 C.F.R. 779.318(b).................................... 22
 29 C.F.R. 779.322...................................... 24
 29 C.F.R. 779.324...................................... 24
 29 C.F.R. 779.330...................................... 26
 29 C.F.R. 779.331...................................... 26
 29 C.F.R. 779.355(b)(1)................................ 20
 29 C.F.R. 779.411..................................... 5,6
 29 C.F.R. 779.414....................................... 4


Miscellaneous:

35 Fed. Reg. 5856 (Apr. 9, 1970)............................. 6

95 Cong. Rec. 12,502 (1949)................................. 21

95 Cong. Rec. 12,505 (1949)................................. 19

95 Cong. Rec. 14,877 (1949)................................. 20

Fed. R. App. P. 29(a)........................................ 1

U.S. Dep't of Labor, Wage and Hour Division, Office of the
 Administrator, Interpretive Bulletin No. 6,
 "Retail and Service Establishments" (June 1941)...... passim

U.S. Dep't of Labor, Wage and Hour Division, Field
 Operations Handbook, § 21ci00 (1990)..................... 22

U.S. Dep't of Labor Opinion Letter,
 WH-40, 1970 WL 26408 (June 11, 1970)..................... 23

U.S. Dep't of Labor Opinion Letter (July 2, 1992).......... 22-23

No. 13-3818
_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

RAMON ALVARADO, <u>et</u> <u>al.</u>,
Plaintiffs-Appellants,

v.

CORPORATE CLEANING SERVICE, INC., <u>et</u> <u>al.</u>,
Defendants-Appellees.
_____

Appeal from the United States District Court for the
Northern District of Illinois, Honorable Edmond E. Chang
_____

**BRIEF FOR THE SECRETARY OF LABOR AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Pursuant to Federal Rule of Appellate Procedure 29(a), the Secretary of Labor ("Secretary") submits this brief as *amicus curiae* in support of plaintiffs-appellants, employees of a high-rise building window cleaning company who have been deemed exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA" or "Act") under its exemption for commission-paid employees of retail or service establishments, 29 U.S.C. 207(i) ("section 7(i)"). As set forth below, the district court wrongly determined that a company that cleans high-rise buildings' windows meets section 7(i)'s requirements for a retail or service establishment.

<u>INTEREST OF THE SECRETARY</u>

The Secretary has a substantial interest in the proper interpretation of the FLSA's statutory provisions because he administers and enforces the Act.  *See* 29 U.S.C. 204, 211(a), 216(c), 217.  Section 7(i) exempts from overtime pay any employee of a retail or service establishment who earns more than half of his or her wages in commissions and whose regular rate is more than one and one-half times the minimum hourly rate required under the FLSA.  *See* 29 U.S.C. 207(i).  The Act's exemptions are to be narrowly construed.  *See Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  By concluding that a high-rise building window washing company is a retail or service establishment, the district court expansively interpreted section 7(i) in such a way that the employees were improperly excluded from the Act's overtime requirements.

Indeed, there are indications that some employers are turning to section 7(i) as a means to limit the Act's overtime protections.  For example, the Secretary recently participated as *amicus curiae* in *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013), in which the court of appeals ruled that the cable installation technicians were likely employees, not independent contractors.  In response to the ruling, the employer moved to amend its answer to allege that its technicians were exempt from overtime compensation pursuant to

section 7(i).  *See Scantland v. Jeffry Knight, Inc.*, No. 09-CV-
1985, Dkt. No. 236 (M.D. Fla. Dec. 30, 2013).  An overly broad
view of what constitutes a retail or service establishment will
likely cause employers to increasingly use section 7(i) as a
means to avoid the FLSA's overtime requirements.

## STATEMENT OF THE ISSUE

Whether the district court correctly held that a company
that cleans high-rise buildings' windows is a "retail or service
establishment" for purposes of section 7(i)'s overtime
exemption.

## STATEMENT OF THE CASE

1.  Section 7(i) was added to the FLSA by the Fair Labor
Standards Amendments of 1961, which expanded the scope of
employees covered by the Act.  *See* Pub. L. No. 87-30, § 6(g), 75
Stat. 65, 70 (1961).  Section 7(i) provides that a "retail or
service establishment" will not violate the Act's overtime pay
requirements with respect to an employee whose workweek exceeds
40 hours if: "(1) the regular rate of pay of such employee is in
excess of one and one-half times the [applicable minimum wage],
and (2) more than half his compensation for a representative
period (not less than one month) represents commissions on goods
or services."  29 U.S.C. 207(i) (reprinted in full as Addendum
A).  Exemptions from the FLSA's overtime requirements, such as
section 7(i), "are to be narrowly construed against the

employers seeking to assert them and their application limited
to those establishments plainly and unmistakably within their
terms and spirit." *Ben Kanowsky,* 361 U.S. at 392.[1]

Section 7(i) was enacted to exempt retail or service
establishments from paying overtime to commission-based
employees under specified circumstances. *See* 29 C.F.R. 779.414.
"These employees are generally employed in so-called 'big
ticket' departments and those establishments or parts of
establishments where commission methods of payment traditionally
have been used, typically those dealing in furniture, bedding
and home furnishings, floor covering, draperies, major
appliances, musical instruments, radios and television, men's
clothing, women's ready to wear, shoes, corsets, home
insulation, and various home custom orders." *Id.*

Section 7(i) does not define "retail or service
establishment"; however, when section 7(i) was added to the
FLSA, there existed in section 13(a)(2) of the Act an exemption
from its minimum wage and overtime requirements for employees
employed in certain retail or service establishments. *See* 29
C.F.R. 779.307, 779.312. The term "retail or service
establishment" for purposes of section 13(a)(2) was defined as

---

[1] This Court has interpreted the Supreme Court's narrow
construction rule to operate as a "tie breaker" in close cases
involving whether an FLSA exemption applies. *Yi v. Sterling
Collision Ctrs.*, 480 F.3d 505, 508 (7th Cir. 2007).

"an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. 779.312; Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393, § 11, 63 Stat. 910, 917 (1949). Congress repealed the section 13(a)(2) exemption in 1989,[2] but the term "retail or service establishment" for purposes of the section 7(i) exemption has the same meaning as that term had in the section 13(a)(2) exemption. *See* 29 C.F.R. 779.312 ("It is clear from the legislative history of the 1961 amendments to the Act [adding the section 7(i) exemption] that no different meaning was intended by the term 'retail or service establishment' from that already established by the Act's definition, wherever used in the new provisions, whether relating to coverage or to exemption."); 29 C.F.R. 779.411 (for purposes of section 7(i)'s exemption, the term "retail or service establishment" is defined in section 13(a)(2) of Act); *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1047 (9th Cir. 2005) ("The § 207(i) definition of 'retail or service establishment' derives from former 29 U.S.C. § 213(a)(2)."); *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993) ("When Congress passed § 207(i) in 1961, it specifically stated that the term 'retail or service

---

[2] *See* Fair Labor Standards Amendments of 1989, Pub. L. No. 101-157, § 3(c)(1), 103 Stat. 938, 939 (1989).

establishment' was to have the same meaning in that section as
it did in § 213(a)(2).") (citing 29 C.F.R. 779.411).

In 1970, the Department of Labor ("Department") issued
interpretive regulations to provide guidance on the Fair Labor
Standards Amendments of 1961 and other amendments. *See* 29
C.F.R. 779.0; 35 Fed. Reg. 5856 (April 9, 1970).[3]  The
regulations break down section 13(a)(2)'s statutory definition
of "retail or service establishment" into three requirements,
providing that: (1) the establishment must engage in the making
of sales of goods or services, (2) at least 75% of its sales of
goods or services must be recognized as retail in the particular
industry, and (3) no more than 25% of its sales of goods or
services may be sales for resale. *See* 29 C.F.R. 779.313.

2.  Plaintiffs-appellants are employed as window washers
for defendant-appellee Corporate Cleaning Service, Inc. ("CCS"),
which provides professional window washing services in the
Chicago area. *See* Plaintiffs-Appellants' Short Appendix ("Short
App."), 3-4.  The vast majority of CCS' gross sales involve
window washing for high-rise buildings; the average height of
the buildings is 30 to 40 stories tall. *See id.* at 3-4, 27.
Approximately 40% of CCS' gross sales were made to commercial
customers — almost exclusively commercial office buildings, and

---

[3] These interpretive regulations are at a minimum entitled to
deference pursuant to *Skidmore v. Swift*, 323 U.S. 134 (1944).
*See* 29 C.F.R. 779.8, 779.9; *see also* footnote 7 *infra*.

for many of those jobs, professional management companies were invoiced (no individual building tenants were invoiced by CCS). *See id.* at 4.  Additionally, approximately 40% of CCS' gross sales were made to residential condominium and apartment buildings, and for most of those jobs, condominium associations or professional management companies were invoiced (no individual unit owners or tenants were billed by CCS).  *See id*.  Less than one per cent of CCS' gross sales were made to individual homeowners.  *See id*.  The employees' building management expert testified that tenants in commercial and residential high-rise buildings generally are not permitted to hire contractors like CCS to perform building maintenance work. *See id*.  According to the expert, the property management firm or condominium association arranges for contractors to perform building maintenance work, including window washing, and passes the cost of the work to tenants or residents in the form of rent, property management fees, or assessments.  *See id*.

3.  The employees sought overtime pay under the FLSA for hours worked over 40 per week.  CCS argued that the employees were exempt from the FLSA's overtime requirements under section 7(i) and moved for summary judgment.  In June 2010, the district court held that CCS was a retail or service establishment but denied CCS' summary judgment motion because there were disputed

issues of material fact as to whether the employees were paid on a commission basis. *See* Short App., 9-25.

4. Addressing the "retail or service establishment" requirement of section 7(i), the district court noted that there is no definition of "retail or service establishment" in the current FLSA. *See* Short App., 10 n.6. It recognized that "[t]he legislative history of the 1961 amendment indicates that Congress intended that, for purposes of § 207(i), the term 'retail or service establishment' should be defined as set out in § 213(a)(2)." *Id.* The district court focused on whether at least 75% of CCS' sales were not for resale and are recognized as retail in its industry. *See id.* at 10.

The employees argued that CCS' services were purchased by building management or condominium associations and were then resold to individual building tenants who actually paid for the services in the form of rent, property management fees, or assessments. *See* Short App., 10-11. The district court, however, agreed with CCS that building management and condominium associations are not middlemen who resell the services, but instead arrange for the provision of the services, for which the building tenants and residents pay. *See id.* at 12. According to the district court, the management companies and condominium associations "are merely conduits, facilitating the purchase of window washing services by the tenants." *Id.*

Thus, the district court concluded that "CCS's sales of services are not for resale." *Id*.

Regarding whether CCS' services are recognized as retail in the window washing industry, the district court noted that the Department's regulations list the following characteristics associated with a retail or service establishment: (1) selling goods or services to the general public; (2) serving the everyday needs of the community in which it is located; (3) being at the end of the stream of distribution; (4) disposing its goods or services in small quantities; and (5) not taking part in the manufacturing process. *See* Short App., 12-13 (citing 29 C.F.R. 779.318(a)). The district court concluded that "CCS appears to satisfy these characteristics." *Id*. at 13. It rejected the employees' contention that CCS did not sell to the general public because less than one per cent of its sales were made to individuals, pointing to the fact that the Fair Labor Standards Amendments of 1949 allowed business-to-business sales to qualify as retail sales. *See id*. The district court also determined that the buildings' tenants and residents were the "ultimate consumers" of CCS' services, and that those tenants "certainly are members of the general public." *Id.* It further concluded that CCS serves the everyday needs of community members who require clean windows in their homes and workplaces, and that CCS provides services at the end of the

9

stream of distribution, disposes of its services in small
quantities, and does not engage in manufacturing. *See id.* at
14-15.

The district court rejected several of the employees' other
arguments as to why CCS' services are not retail.  In
particular, the employees argued that CCS' services are related
to the "maintenance of loft and office buildings," which is
included on the list of businesses found in the Department's
regulations, 29 C.F.R. 779.317, that the Department has
determined lack a retail concept. *See* Short App., 16.  The
district court noted that the Department's list also includes
"air-conditioning and heating systems contractors, elevator
repair businesses, painting contractors, plumbing contractors,
and roofing contractors." *Id*. (citing 29 C.F.R. 779.317).
However, the district court declined to defer to the
Department's view that building maintenance businesses lack a
retail concept, noting that the regulation relies on *Kirschbaum
v. Walling*, 316 U.S. 517 (1942), which addressed selling space
in a loft building but "said nothing about whether the sale of
building maintenance services could be considered retail." *Id.*
at 16-17.  Because the district court concluded that CCS
satisfied the criteria in 29 C.F.R. 779.318(a) (characteristics
of retail or service establishments), it declined to defer to

10

the Department's list of businesses lacking a retail concept
found in 29 C.F.R. 779.317.  *See id.*

5.  Although the district court ruled that CCS was a retail
or service establishment, it denied CCS' summary judgment motion
because of the disputed facts as to whether CCS' compensation
system paid employees on a commission basis.  *See* Short App.,
18-25.  The case proceeded to a bench trial on that issue.  In
November 2013, the district court ruled that the employees were
paid on a commission basis and that the section 7(i) exemption
applied.  *See id.* at 54.

ARGUMENT

> THE DISTRICT COURT ERRED BY CONCLUDING THAT CCS IS A
> RETAIL OR SERVICE ESTABLISHMENT BECAUSE CCS LACKS A
> RETAIL CONCEPT, DOES NOT SELL ITS SERVICES TO THE
> GENERAL PUBLIC, FAILED TO DEMONSTRATE THAT ITS
> SERVICES ARE RECOGNIZED AS RETAIL, AND SELLS ITS
> SERVICES FOR RESALE

The district court erroneously determined that CCS met the
requirements of a "retail or service establishment" for purposes
of section 7(i) because: (1) the legislative history, Supreme
Court case law, and the Department's regulations and other
interpretations show that building maintenance lacks a retail
concept; (2) CCS does not sell its services to the general
public — a fundamental characteristic of a retail or service
establishment; (3) CCS failed to present any evidence that its

sales are "recognized" as retail in the window washing industry;
and (4) CCS' sales of services are sales for resale.

1.   The Building Maintenance Industry Has Historically Lacked a
     Retail Concept, and the Categorical Exclusion of this
     Industry from Having a Retail Concept Has Been Sanctioned
     by Congress.

Although the term "retail or service establishment" was
present in the FLSA at its enactment in the form of section
13(a)(2)'s exemption for retail or service establishments, the
term was not initially defined in the Act.  *See* Pub. L. No. 75-
718, § 13(a), 52 Stat. 1060, 1067 (1938).  Consistent with the
role of administering and enforcing the Act, the Department's
Wage and Hour Administrator issued in 1941 an interpretation of
the retail or service establishment exemption, particularly the
meaning of "retail or service establishment," in Interpretive
Bulletin No. 6.  *See* U.S. Dep't of Labor, Wage and Hour
Division, Office of the Administrator, Interpretive Bulletin No.
6, "Retail and Service Establishments" (June 1941) (relevant
excerpts are attached as Addendum B).[4]

Interpretive Bulletin No. 6 noted that the term "service
establishment" was intended to capture businesses that were
similar to retail establishments and that were usually local in
character, usually open to the general consuming public, and

---

[4] As the title page of Interpretive Bulletin No. 6 makes clear,
it was originally issued in December 1938, and a revised version
was issued in June 1941.

usually engaged in rendering services to private individuals for direct consumption.  *See* Interpretive Bulletin No. 6, ¶¶ 22-23.[5] The Bulletin further noted that such services were "usually purchased in small quantities for private use rather than for industrial or business purposes" and were usually rendered at a "retail" price.  *Id.*, ¶ 23.  The Bulletin distinguished between establishments that service goods owned by the general consuming public and those establishments that service goods that have only an industrial or business market, where the establishment is similar to a wholesaler with respect to the price and quantity of the services provided.  *See id.*, ¶ 25. Significantly, the Bulletin listed specific examples of the types of businesses determined "in the ordinary case" not to be "sufficiently similar in character to retail establishments to be considered service establishments."  *Id.*, ¶ 29.  Thus, the Department determined that the businesses on this list, including "building contractors" and "companies engaged in repairing elevators," categorically do <u>not</u> qualify as service establishments under the Act's definition.  *Id.*

The Department's interpretations in Interpretive Bulletin No. 6 were given "Congressional sanction" in 1949 when section 13(a)(2) of the Act was amended to define "retail or service

---

[5] Retail establishments sell goods or merchandise.  *See* Interpretive Bulletin No. 6, ¶¶ 8-18.  Window washing companies sell a service as opposed to goods or merchandise.

establishment." 29 C.F.R. 779.9. In the Fair Labor Standards Amendments of 1949, Congress specifically stated that any order, regulation, or interpretation of the Administrator or the Secretary then in effect "shall remain in effect as an order, regulation, [or] interpretation, . . . except to the extent that any such order, regulation, [or] interpretation . . . may be inconsistent with the provisions of this Act," or may be modified by the Administrator or the Secretary. Pub. L. No. 81-393, § 16(c), 63 Stat. 910, 920 (1949); *see* 29 U.S.C. 208 (historical note). Thus, Congress ratified the Department's interpretation of "retail or service establishment" set forth in Interpretive Bulletin No. 6, including the conclusion that certain businesses such as building contractors and those engaged in elevator repair — businesses that are analogous to CCS' high-rise building window washing business — lack a retail concept.

Subsequent Supreme Court decisions explained Congress' intent behind the Fair Labor Standards Amendments of 1949 and applied in a deferential manner the interpretations in Interpretive Bulletin No. 6. Thus, the Supreme Court stated that the 1949 amendments were <u>not</u> intended "to broaden the fields of business enterprise to which the exemption would apply." *Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 294 (1959). Rather, the amendments' purpose was to overturn the

Supreme Court's decision in *Roland Elec. Co. v. Walling*, 326
U.S. 657 (1946), and to "change the prior law <u>only</u> by making it
possible for business enterprises <u>otherwise eligible under
existing concepts</u> to achieve exemption even though . . . their
sales were to other than private individuals." *Kentucky Fin.*,
359 U.S. at 294 (emphases added).[6]  Moreover, in *Kentucky
Finance*, the Supreme Court concluded that personal loan
companies were not retail or service establishments because
Interpretive Bulletin No. 6 had previously expressly determined
that they were outside the term's meaning.  *See id.* at 291-95.
The Court explained that "enterprises in the financial field,
none of which had previously been considered to qualify for the
exemption [by the Department in Interpretive Bulletin No. 6]
regardless of the class of persons with which they dealt, and
regardless of whether they were thought of in the financial
industry as engaged in 'retail financing,' remained unaffected
by the amendment of [section 13(a)(2)]." *Id.* at 294-95.

---

[6] In *Roland Electric*, the Supreme Court affirmed a Department
interpretation that an establishment could not qualify as a
retail or service establishment unless it sold its goods or
services to <u>private individuals</u>.  *See* 326 U.S. at 676-78.  The
Fair Labor Standards Amendments of 1949 amended section 13(a)(2)
to define "retail or service establishment" and to allow sales
to <u>businesses</u> to constitute retail sales if they did not involve
resale and were recognized in the industry as retail.  *See
Kentucky Fin.*, 359 U.S. at 293-95 (explaining the legislative
history of the 1949 amendment to section 13(a)(2)).  No other
existing Department interpretations were affected.

Other Supreme Court cases have embraced *Kentucky Finance*'s analysis and confirmed that the 1949 amendments were not intended to broaden the scope of "retail or service establishment" and that certain types of service businesses categorically do not qualify for the exemption.  In *Ben Kanowsky,* the Supreme Court emphasized *Kentucky Finance*'s holding "that the 1949 revision does not represent a general broadening of the exemptions contained in [section 13(a)(2)]." 361 U.S. at 391-92.  And in *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 198-202 (1966), the Supreme Court relied on *Kentucky Finance*'s historical approach to reject the employer's view of the meaning of "retail or service establishment."  The Court explained that the sale of some services are not "retail" for purposes of section 13(a)(2) even if they are "recognized as retail in the particular industry." *Id.* at 202-05.  It relied on the Department's guidance documents and legislative history to indicate that typically "retail" sales will involve goods or services that are usually (but not necessarily always) acquired "for family or personal use." *Id.* at 203-05.  The Court explained that "it is generally helpful to ask first whether the sale of a particular type of goods or services can ever qualify as retail whatever the terms of sale" before considering the "terms or circumstances that make a sale of those goods or services a retail sale." *Id.* at 202-03.  In concluding that the

businesses at issue were not retail or service establishments,
the Court noted that the Department's "considerable discretion"
in determining which businesses qualify as retail "should not be
understressed." *Id.* at 205.

Embracing the reasoning of these Supreme Court decisions
and the interpretations set forth in Interpretative Bulletin No.
6 that were ratified by Congress, the Department issued
regulations in 1970 explaining that an establishment must have a
"retail concept" to satisfy the exemption:

> The term "retail" is alien to some businesses or
> operations. . . .  As to establishments of such businesses,
> therefore, a concept of retail selling or servicing does
> not exist.  That it was the intent of Congress to exclude
> such businesses from the term "retail or service
> establishment" is clearly demonstrated by the legislative
> history of the 1949 amendments and by the judicial
> construction given said term both before and after the 1949
> amendments.  It also should be noted from the judicial
> pronouncements that a "retail concept" cannot be
> artificially created in an industry in which there is no
> traditional concept of retail selling or servicing. . . .
> It is plain, therefore, that the term "retail or service
> establishment" as used in the Act does not encompass
> establishments in industries lacking a "retail concept".
> Such establishments not having been traditionally regarded
> as retail or service establishments cannot under any
> circumstances qualify as a "retail or service
> establishment" within the statutory definition of the Act,
> since they fail to meet the first requirement of the
> statutory definition. . . .  Judicial authority is quite
> clear that there are certain goods and services which can
> never be sold at retail.

29 C.F.R. 779.316.  This regulation follows Supreme Court
precedent in emphasizing the legislative history of the 1949
amendments to the FLSA and traditional understandings of

particular industries. *See id.; see also Idaho Sheet Metal*, 383
U.S. at 202-03 (requiring the industry as a general matter to
have a "retail concept" in order for a particular business in
that industry to qualify as a "retail or service
establishment").

The regulations also contain a "partial list" of types of
businesses that, based largely on case law as well as
legislative history and prior guidance, "have no retail concept"
and thus categorically cannot qualify as retail or service
establishments. 29 C.F.R. 779.317. The list includes building
contractors and elevator repair businesses (as did Interpretive
Bulletin No. 6), businesses "engaged in renting and maintenance"
of "loft buildings or office buildings," and building
maintenance businesses such as air-conditioning and heating
systems contractors and painting, plumbing, and roofing
contractors. *Id.*[7] CCS' high-rise building window washing
business falls squarely within the building service,

---

[7] The Department's interpretive regulations are at a minimum
entitled to *Skidmore* deference. *See* 29 C.F.R. 779.8, 779.9; *see
also* footnote 3 *supra*. Moreover, some interpretations in these
regulations also have "Congressional sanction" because, as
explained *supra*, Congress approved when enacting the Fair Labor
Standards Amendments of 1949 all of the Department's pre-1949
interpretations unless they were inconsistent with the 1949 FLSA
amendments. 29 C.F.R. 779.9; *see Kentucky Fin.*, 359 U.S. at 292
(citing Pub. L. No. 81-393, § 16(c), 63 Stat. 910, 920 (1949)).
The interpretation at 29 C.F.R. 779.317, certainly insofar as it
identifies building contractors and elevator repair businesses
as being outside the scope of retail or service establishments,
has such "Congressional sanction."

maintenance, and repair businesses that the Department has
determined since the FLSA's enactment, as subsequently supported
by the statutory history and Supreme Court precedent, lack a
retail concept and cannot qualify as retail or service
establishments.

In response to the employees' argument that CCS' high-rise
building window washing business lacked a retail concept, the
district court declined to defer to 29 C.F.R. 779.317.  It
determined that the regulation identifies the Supreme Court's
decision in *Kirschbaum v. Walling* as the basis for including
businesses engaged in maintaining office buildings on the list
of establishments to which the retail concept does not apply,
but *Kirschbaum* "said nothing about whether the sale of building
maintenance services could be considered retail."  Short App.,
16-17.  However, even if *Kirschbaum* itself did not directly hold
that the sale of building maintenance services lacks a retail
concept, the regulation also identifies an instructive statement
from Senator Holland, sponsor of the 1949 Senate amendment to
section 13(a)(2), regarding building maintenance services.  *See*
29 C.F.R. 779.317.  Senator Holland stated that the "renting and
maintenance of a loft building or of an office building are
<u>wholly unrelated to the concept of retail selling or servicing</u>"
and that the 1949 amendment would not change that
interpretation.  95 Cong. Rec. 12,505 (1949) (emphasis added).

19

As further evidence of congressional intent, a conference report
on the 1949 section 13(a)(2) amendment explains that the
agreement reached in conference did not "change the status of
. . . firms renting or maintaining loft or office buildings
(such as those held non-exempt in *Kirschbaum v. Walling*, 316
U.S. 517)."  95 Cong. Rec. 14,877 (1949).

Given this legislative history with respect to building
maintenance services, the district court should have concluded
that CCS lacks a retail concept because "a 'retail concept'
cannot be artificially created in an industry in which there is
no traditional concept of retail selling or servicing."  29
C.F.R. 779.316; *see Kentucky Fin.*, 359 U.S. at 294 ("[N]othing
in the debates or reports . . . suggests that Congress intended
by the amendment to broaden the fields of business enterprise to
which the exemption would apply."); *cf.* 29 C.F.R. 779.355(b)(1)
(contracts to maintain buildings or "any other work recognized
as an activity of a contracting business rather than a function
of a retail merchant" are not retail sales under section
13(a)(2)).

Thus, the conclusion that building maintenance businesses
such as CCS' building window washing business categorically lack
a retail concept is supported by the Department's prior
interpretations in Interpretive Bulletin No. 6, those
interpretations' ratification by Congress in 1949, the

legislative history behind the meaning of "retail or service establishment," Supreme Court case law, and the Department's "considerable discretion" in determining which businesses qualify as retail, *Idaho Sheet Metal*, 383 U.S. at 205, which it exercised by promulgating regulations that affirm the historical meaning of "retail or service establishment" as sanctioned by Congress and the Supreme Court.  Accordingly, the district court erred by ruling that CCS' window washers are exempt under section 7(i).

2.    CCS Lacks a Fundamental Characteristic of a Retail or Service Establishment.

According to the Department's regulations, the salient characteristic of a retail or service establishment is that it sells its goods or services to the general public.  *See* 29 C.F.R. 779.318(a).[8]  Thus, selling goods or services to the

---

[8] The 1949 amendment to section 13(a)(2), as discussed in footnote 6 *supra*, established that the exemption was not only available for sales of goods or services to private individuals for family or household use, but was also available to retail establishments that made the same type of sale to a business. *See, e.g.,* 95 Cong. Rec. 12,502 (1949) ("[T]he services of hotels, restaurants, repair garages, filling stations, and the like, whether rendered to private householders or to business customers, will be retail, so long as they are regarded as retail services in such trades.  No longer will it be possible [to conclude] that if an automobile dealer sells a truck to the local butcher, baker, or grocer the sale is not retail, but if he sells a passenger car to a private consumer the sale is retail.") (Statement of Senator Holland).  The Department's regulations also explain that Congress "intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for

general public is fundamental for an establishment to satisfy
the first requirement — making sales of goods or services.  *See*
29 C.F.R. 779.313.

CCS' services, however, are akin to specialized industrial
maintenance services "which the general consuming public does
not ordinarily have occasion to use."  U.S. Dep't of Labor, Wage
and Hour Division, Field Operations Handbook, § 21ci00 (1990)
(available at http://www.dol.gov/whd/FOH/FOH_Ch21.pdf; copy
attached as Addendum C).  The full provision of the Field
Operations Handbook, entitled "Industrial maintenance services,"
is instructive:

> An organization which cleans air ducts, elevator shafts,
> air conditioning equipment, ventilating systems, flues,
> stacks, and the like, and repairs and refills fire
> extinguishers, fireproofs drapes, decorations, show booths,
> and the like, and performs maintenance work almost entirely
> for commercial or industrial establishments is performing
> specialized services which the general consuming public
> does not ordinarily have occasion to use.  The organization
> is not engaged in activities which are traditionally
> recognized as retail even though it may also sometimes sell
> goods or render services to the general consuming public.

*Id.*  The Department has also expressed this position in opinion
letters.  *See*, *e.g.*, U.S. Dep't of Labor Opinion Letter (July 2,

---

family or noncommercial use."  29 C.F.R. 779.318(b).  However,
"[t]he list of strictly commercial items whose sale can be
deemed retail is very small and a determination as to the
application of the retail exemption in specific cases would
depend upon the consideration of all the circumstances relevant
to the situation."  *Id.*  Here, the nature of CCS' business —
particularly the type and scope of services that it provides —
does not qualify it as a retail or service establishment under
section 7(i).

1992) (opining that the "sale of specialized alarm systems to
commercial customers which the general consuming public would
never or almost never purchase and the sale of maintenance and
monitoring services related to such specialized alarm systems
would not be recognized as retail sales") (copy attached as
Addendum D); U.S. Dep't of Labor Opinion Letter WH-40, 1970 WL
26408 (June 11, 1970) (opining that a business that
predominantly provided cleaning services to industrial and
commercial firms using specialized equipment did not provide
services to the general consuming public and could not satisfy
the definition of a retail or service establishment).  Because
high-rise building window washing, like other industrial
maintenance services, lacks the fundamental characteristic of
selling goods or services to the general public, CCS cannot
satisfy section 7(i)'s exemption.

3.   CCS Failed to Demonstrate That Its Sales Are Recognized as
     Retail Sales or Services in Its Particular Industry.

     Assuming arguendo that CCS does not lack a retail concept
and makes sales of goods or services to the general public, "the
second requirement for qualifying as a 'retail or service
establishment' within that term's statutory definition is that
75 percent of the establishment's annual dollar volume must be
derived from sales of goods or services (or both) which are
recognized as retail sales or services in the particular

industry." 29 C.F.R. 779.322. The Department's regulations
explain that it is "clear from the legislative history and
judicial pronouncements that it was not the intent of this
provision to delegate to employers in any particular industry
the power to exempt themselves from the requirements of the
Act." 29 C.F.R. 779.324. This determination "must take into
consideration the well-settled habits of business, traditional
understanding and common knowledge," including the understanding
of "the purchaser as well as the seller, the wholesaler as well
as the retailer, the employee as well as the employer, and
private and governmental research and statistical organizations"
and "others who have knowledge of recognized classifications in
an industry." *Id.*

      The district court failed to address any of the above
criteria for determining whether CCS' sales are recognized as
retail sales in the industry; it similarly failed to require CCS
to meet its burden of establishing that its sales were
"recognized" as retail "in the particular industry." The
Supreme Court has made clear that a court may not assume that an
employer's sales are recognized as retail without any evidence
to support that fact, given that "it is clear that Congress
intended that any employer who asserts that his establishment is
exempt must assume the burden of proving that at least 75
percent of his sales are recognized in his industry as retail."

*Ben Kanowsky*, 361 U.S. at 393 (internal quotation marks
omitted); *see Owopetu v. Nationwide CATV Auditing Servs., Inc.
(Owopetu I)*, No. 10-CV-18, 2011 WL 883703, at *9 (D. Vt. Mar.
11, 2011) (denying summary judgment where employer "has not
offered any evidence as to how persons in the industry and
knowledge of the industry view [its] business") (internal
quotation marks omitted).  CCS put forward no evidence that its
sales were recognized as retail <u>in the industry</u>.  Instead, it
referenced only the characteristics of retail establishments
from 29 C.F.R. 779.318 in its summary judgment motion.  CCS did
not, for example, submit an affidavit explaining in any way how
sales of high-rise building window washing services are
recognized as retail in that particular industry.  *Compare Jones
v. Tucker Commc'n, Inc.*, No. 11-CV-398, 2013 WL 6072966, at *9
(M.D. Ga. Nov. 18, 2013) (discussing an affidavit filed by
someone familiar with the cable industry); *Owopetu v. Nationwide
CATV Auditing Servs., Inc. (Owopetu II)*, No. 10-CV-18, 2011 WL
4433159, at *5 (D. Vt. Sept. 21, 2011) (discussing two
affidavits filed by persons with knowledge of the
telecommunications industry).  Therefore, for this reason as
well, CCS failed to establish that it qualifies for section
7(i)'s exemption.

4.   CCS Sells Its Services for Resale, Precluding Application
     of Section 7(i).

Section 7(i)'s third requirement is that no more than 25%
of the establishment's annual dollar volume may be from sales of
goods or services that are made for resale.  *See* 29 C.F.R.
779.330.  The common meaning of "resale" is "selling again," and
the regulations describe a sale of services for resale as one
"where the seller knows or has reasonable cause to believe [that
the goods or services] will be resold." 29 C.F.R. 779.331.  As
the regulations further explain, "sales for distribution by the
purchaser for business purposes are sales for resale . . . even
though distributed at no cost to the ultimate recipient." *Id.*

CCS sells its window-washing services to building managers
and condominium associations, which arrange for building
tenants' windows to be cleaned and then pass along, as
intermediaries, the cost of this service.  There is a well-
established line of appellate cases (many of which are cited in
the Department's regulations) that view goods or services passed
onto another via a third party as sales for resale.  For
example, in *Gray v. Swanney-McDonald, Inc.*, 436 F.2d 652, 654
(9th Cir. 1971), the Ninth Circuit held that a towing company
that towed cars for members of the National Auto Club and for
local repair shops was engaged in a sale of services for resale
because the Club and the repair shops passed the towing cost on

to their customers in the form of increased membership fees and repair rates. Similarly, in *Mitchell v. Sherry Corine Corp.*, 264 F.2d 831, 835 (4th Cir. 1959), the Fourth Circuit held that a company that sold meals to airlines, which then served the meals to passengers on flights, was engaged in sales for resale because the cost of the meals was "an operating expense taken into account in computing the rates of transportation." And in *Goldberg v. Furman Beauty Supply, Inc.*, 300 F.2d 16, 18–19 (3d Cir. 1962), the Third Circuit held that a beauty supply company that sold products to salons that used the products while providing services to their customers was engaged in sales for resale because the prices charged by the beauty parlor covered the cost of purchasing the beauty supply products. Significantly, the Fifth Circuit held that a company that provided plumbing, heating, and air conditioning services as a subcontractor for a general contractor — providing its services directly to the "ultimate consumer" or "owner" while receiving payment under the subcontract with the general contractor — was engaged in sales for resale. *See Goldberg v. Kleban Eng'g Corp.*, 303 F.2d 855, 858 (5th Cir. 1962). The Fifth Circuit recognized that it was conceivable that a supplier could sell directly to the owner of the building and receive payment directly from the owner for work performed, but in this scenario the general contractor was a "significant intermediary" and

27

"[n]o intricate web of legalistic theories . . . can convert this accepted commercial transaction between the subcontractor and general contractor into one between the supplier and owner direct." *Id.*

The district court ignored these cases, relying instead on a line of predominantly district court cases allowing food service subcontractors to claim the retail or service exemption on grounds that the educational institutions to which students paid fees for meals were simply conduits through which funds flowed to the food service company/employer that provided those meals. *See* Short App., 11-12; *cf. Hodgson v. ARA Servs., Inc.*, 392 F. Supp. 1167, 1173 (W.D. Va. 1975) (acknowledging the two lines of cases involving the question of sale for resale in "three-partite" business arrangements). The line of appellate cases, however, not only constitutes more persuasive authority, but also contains more persuasive reasoning. Just as the towing company in *Gray* and the building services subcontractor in *Kleban* provided their services directly to the end user or ultimate consumer without charging them because they sold their services directly to the entity that engaged those services, CCS was hired by building managers or condominium associations to clean the windows of building tenants or owners. CCS certainly knew that the cost of its window-washing services would be resold to the building tenants or owners in some form, whether

28

it be rent, condominium association fees, or specific line item charges for window washing imposed by building managers.  Thus, in this case, there was a distinct third party arrangement involving a real intermediary and an actual sale for resale, which precludes application of section 7(i)'s exemption.

CONCLUSION

For the foregoing reasons, this Court should reverse the district court's ruling that the employees were exempt from the FLSA's overtime requirements under section 7(i).

Respectfully submitted,

M. PATRICIA SMITH
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

PAUL L. FRIEDEN
Counsel for Appellate Litigation

/s/ Dean A. Romhilt
LAURA MOSKOWITZ
DEAN A. ROMHILT
Senior Attorneys

U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Room N-2716
Washington, D.C.  20210
(202) 693-5550

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 29(c)(5) and 32(a)(7)(C), I certify that the foregoing Brief for the Secretary of Labor as Amicus Curiae in Support of Plaintiffs-Appellants:

(1) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a monospaced typeface using Microsoft Word utilizing Courier New 12-point font containing no more than 10.5 characters per inch, and

(2) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6,429 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).


<u>/s/ Dean A. Romhilt</u>
DEAN A. ROMHILT

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Brief for the Secretary of Labor as *Amicus Curiae* in Support of Plaintiffs-Appellants was served this 17th day of July, 2014, via this Court's ECF system and pre-paid overnight delivery, on the following:

Ira M. Levin
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue
21st Floor
Chicago, IL  60611

Douglas M. Werman
Werman Law Office, P.C.
77 West Washington Street
Suite 1402
Chicago, IL 60602

/s/ Dean A. Romhilt
DEAN A. ROMHILT

# ADDENDUM  A

## **29 U.S.C. 207(i)**

No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.    In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

# ADDENDUM  B

Case: 13-3818   Document: 32   Filed: 07/17/2014   Pages: 56

HD
8052
A42
no.6
1941



INTERPRETATIVE BULLETIN

No. 6

# Retail and Service Establishments

**The Scope and Applicability of the Exemption
Provided by Section 13(a)(2) of the Fair Labor
Standards Act of 1938**

**June 1941[1]**



UNITED STATES DEPARTMENT OF LABOR

WAGE AND HOUR DIVISION

OFFICE OF THE ADMINISTRATOR

[1] Originally issued December 1938. Revised June 1941.

becomes unnecessary to ascertain whether section 13 (a) (2) affords an exemption. In this connection, attention is directed to Interpretative Bulletins No. 1 and No. 5 which discuss the coverage of sections 6 and 7.

5. It should be noted that the test prescribed in sections 6 and 7 is related to the nature of employment of the particular *employee*. The criterion used in section 13 (a) (2), on the other hand, is the nature of the establishment in which the employee is engaged. Thus, under sections 6 and 7 *some* employees of a given industry or of a given employer may be covered and others may not be covered. If, however, the exemption provided by section 13 (a) (2) is applicable because the greater part of the selling or servicing of the retail or service establishment is in intrastate commerce, *all* employees engaged in the establishment are exempted from sections 6 and 7.

## RETAIL ESTABLISHMENTS

6. At times it has been assumed that an establishment is a retail establishment unless it is shown to be a wholesale, manufacturing, or other well-recognized type of establishment. In our judgment, this assumption is incorrect. The applicability of the exemption rests upon an affirmative showing that the particular establishment is properly to be characterized as retail. Obviously, the fact that it is not strictly a wholesale or manufacturing establishment does not mean that it is, therefore, a *retail* establishment. Thus, it is commonly recognized that chain-store warehouses possess the attributes of wholesale establishments. However, they sometimes are not classified strictly as wholesale establishments because they do not "sell" but merely distribute to the chain stores. In any event, such warehouses are not *retail* establishments since they do not possess the attributes of retail establishments.

7. Ordinarily the determination of whether a particular establishment is a retail establishment is not difficult. A retail establishment has certain well-defined characteristics which distinguish it from nonretail establishments. In many cases, however, the adoption of new methods of distribution and the assumption of additional functions by establishments engaged in distribution create doubt as to the proper classification of the establishments. In these cases no hard and fast rule is possible and the determination depends upon an appraisal of all the facts. Since section 13 (a) (2) should be construed narrowly, doubts should be resolved against the applicability of the exemption.

8. The following discussion is intended to indicate the principal attributes of a retail establishment. An establishment which possesses such attributes will, in our opinion, be a retail establishment within the meaning of section 13 (a) (2).

9. Although retail establishments are not uniform in appearance or manner of operation, they possess a number of common physical characteristics which serve as a helpful guide in determining whether a particular establishment is appropriately to be classified as a retail establishment for purposes of section 13 (a) (2). Ordinarily sales clerks are employed in the establishment to assist customers in mak-

ing purchases rather than outside salesmen who solicit orders.[5] Retail establishments usually have selling counters, cash registers to ring up sales, shelves for the display and convenient arrangement of merchandise, and display windows to attract the patronage of the general public. Retail establishments maintain a stock of merchandise on hand and normally make sales over the counter from such stock. They do not have manufacturing equipment or other machinery normally found in factories. The foregoing attributes are not rigid criteria to be applied with mathematical precision since retail establishments vary even with respect to these matters. These tests do furnish, however, a reliable rule of thumb in ascertaining the nature of the establishment and their absence in any material degree normally indicates that an establishment is not a retail establishment for purposes of section 13 (a) (2).

10. A retail establishment is characterized by numerous small sales. It sells merchandise in small quantities and at prices which are higher than the prices involved in sales by wholesalers or jobbers. What constitutes a small quantity of goods depends, of course, upon the facts in the particular case and the quantity will vary with different commodities. Thus, a different measure would be applied in ascertaining sales of small quantities of canned tomato juice, bed sheets, furniture, coal, etc. The "quantity" and "price" tests, however, are well-recognized business concepts. There are reasonably definite limits as to the quantity of a particular commodity which the general consuming public regularly purchases at a given time and businessmen are aware of these buying habits. In our opinion, sales involving quantities of goods materially in excess of such reasonable limits may not be considered as retail sales, if such sales involve a special discount from the normal retail price. The "normal retail price" of a particular commodity is not uniform or fixed and often varies even in the same community. What is meant here, however, is the usual price incident to the sale of that quantity of goods normally purchased by private individuals from the particular establishment as distinguished from the price incident to the sale of a larger quantity of goods. Obviously, the sale of goods in a quantity approximating the quantity involved in a normal wholesale transaction and as to which a special discount from the regular retail price is given would not be a retail sale.

11. A retail establishment is patronized regularly by the general consuming public. It is characteristic of wholesale establishments to exclude the general consuming public, as a matter of established business policy, and to confine their sales to other wholesalers, retailers, and large-scale industrial or business purchasers. As a general rule, any establishment which refuses to sell to the general consuming public will not be considered a retail establishment. In some cases, however, the sales of an establishment are made almost exclusively to business and industrial purchasers, even though the establishment does not actually refuse to sell to the general consuming public. Thus, many establishments are engaged in selling goods which have only an industrial or business market, e. g., establishments engaged in selling production machinery, freight trailers, oil-well drilling ma-

---

[5] It is recognized, of course, that some retail establishments operate on a self-service plan and that retail sales are sometimes made by outside salesmen.

chinery and equipment, etc. These establishments are not retail establishments within the meaning of section 13 (a) (2) since they do not sell regularly to the general consuming public.[6]

12. A retail sale is a sale of goods for direct consumption and not for purposes of resale or redistribution in any form. Sales to wholesalers, jobbers, or retailers for resale by them are not retail sales, regardless of the price or quantity involved.[7] Similarly, the distribution of goods from a chain-store warehouse to retail stores of the chain is not retail distribution, and the warehouse is not a retail establishment. The fact that the distribution from the warehouse to the stores does not involve a "sale" in the strict legal sense does not alter the nonretail character of the distribution. In some cases, however, an establishment exchanges goods as a favor to a competitor. For example, an automobile dealer may have a demand for a maroon-colored automobile which he does not have in stock. To satisfy his customer, the dealer exchanges a black car for a maroon model which his competitor has in stock. In our opinion, such exchanges may be disregarded in analyzing the selling of the establishment.

13. In some cases, goods are resold or redistributed after processing or manufacture. Any sale of goods for purposes of resale by the purchaser after processing or manufacture is not a retail sale. Thus, the sale of wood to furniture or box factories or the sale of textiles to clothing manufacturers is not a retail sale even though the goods are not resold in the same form.

14. A retail establishment sells goods to private individuals for personal or family consumption. Typically it sells "consumer" goods such as food or clothing to private persons to satisfy their personal wants. In some cases, however, establishments sell "consumer" goods to business or industrial purchasers, government agencies, institutions, and similar purchasers, as well as to private individuals for private consumption. For example, both commercial enterprises and private individuals purchase coal and fuel oil for heating purposes. The sale of coal or fuel oil to heat a private home is a retail sale. The sale of such goods to heat a store or business office will also be a retail sale if the goods are sold at the normal price charged to private consumers or if the sale does not involve a quantity of goods

[6] Ordinarily the following types of goods have only an industrial or business market and are not sold to the general consuming public. Accordingly, sales of such goods, in the ordinary case, are not retail. It should be noted that the types of goods listed below are merely examples and do not comprise an exhaustive enumeration.
Automatic vending machinery, butchers' equipment, filling station equipment, hotel and restaurant equipment, soda fountain equipment, and store equipment.
Constuction equipment (such as derricks, scaffolding, and elevators), construction machinery (such as concrete mixers, sanding and polishing machines, excavating shovels, and graders), and road machinery and equipment.
Bakers' equipment, bottles and bottling equipment, canning machinery, chemical equipment, conveyor and hoisting machinery, drilling machinery, foundry equipment, jewelers' equipment, machine tools, mechanical rubber goods (such as belting, packing, gaskets, and recoil pads), mill and mine supplies, power engines, powerhouse equipment (such as boilers, condensers, injectors, filters, and stokers), printers' and lithographers' supplies, shoe machinery, textile machinery and equipment, and welding equipment.
Dental supplies and equipment (such as dentist chairs, drilling machines, X-ray machines, etc.), pharmacists' supplies, school equipment and supplies (such as schoolroom blackboards, schoolroom desks, etc.), laboratory equipment and supplies, and hospital equipment and supplies (such as operating instruments, X-ray machines, operating tables, etc.).
Barber and beauty parlor equipment, dry cleaners' supplies, commercial laundry equipment and supplies, plumbers' equipment, shoe repairers' equipment, undertakers' supplies, upholsterers' supplies, and warehouse equipment and supplies.
Commercial aircraft and aeronautical equipment, railroad equipment and supplies, commercial ship equipment and supplies, and other commercial transportation equipment and supplies (such as tramways, aerial hoists, motorboats and compressed-air tubes).
[7] An additional ground for reaching the same result is that sales for purposes of resale normally involve large quantities of goods and discounts from the regular retail price.

materially larger than the normal quantity purchased by private consumers.

15. In the ordinary case the quantity of goods involved in the particular transaction or sale will determine whether the sale is one of a "small quantity" of such goods. In some cases, however, a business or industrial purchaser contracts at a special discount from the regular retail price for the purchase of a large quantity of goods to be delivered in smaller quantities from time to time, as the occasion requires. Such a sale does not contemplate a small quantity of goods and is not a retail sale even though each delivery, viewed separately, involves a small quantity of goods. This result would not be changed if, instead of entering into a single contract for the entire amount of goods, there are a series of regular deliveries pursuant to a quotation, bid, estimate, or general business arrangement or understanding. If the total quantity of goods which is sold to the business or industrial purchaser at a discount from the normal retail price is materially in excess of the total quantity of goods which might reasonably be purchased by an individual consumer during the same period, sales to such business, industrial, or institutional purchasers are not retail.[8]

16. A retail establishment may not only sell merchandise but may also perform service incidental or necessary to the use of such goods. Thus, a retail establishment may also perform, in connection with its retail selling, the usual servicing rendered by establishments of a similar character. The neighborhood grocery gives delivery service to its customers and the radio dealer often renders the service of putting up aerials for his customers. Such incidental service will not affect the character of the establishment as a retail establishment.

17. Processing incidental to retail selling ordinarily will not alter the retail character of the establishment and defeat the exemption. A retail clothing store is a retail establishment even though it makes the necessary alterations on ready-to-wear suits which are sold to its customers. On the other hand, an establishment which is engaged in manufacturing operations is not a retail establishment even though the goods which it manufactures are distributed at retail. Thus, for example, a custom tailor engaged in manufacturing clothes to order would be engaged in manufacturing operations and would not operate a retail establishment. The distinction between incidental processing and actual manufacturing is often one of degree.

18. The foregoing discussion indicates the principal attributes of a retail establishment for purposes of section 13 (a) (2). Minor discrepancies, of course, will not defeat the exemption. Major variations from the pattern, however, do indicate that the exemption is inapplicable.[9] Thus, for example, an establishment which makes some nonretail sales nevertheless would be considered a retail establishment if the gross receipts from nonretail sales are not substantial in relation to the total gross receipts of the establishment. For purposes of enforcement the Administrator will ordinarily consider the

[8] Ordinarily, large-scale purchasers can easily be identified by an examination of the terms of purchase and the size of the account in terms of dollars. Obviously, if the account shows a dollar volume of sales materially in excess of the amounts sold to individual private consumers, it demonstrates also that the purchaser bought in quantities materially in excess of the quantities purchased by individual consumers.
[9] In this connection attention is directed to paragraphs 33–43 below.
319847°—41——2

nonretail selling of an establishment to be substantial if the gross receipts from such selling constitute more than one-quarter (25 percent) of the total gross receipts of the establishment.

19. For purposes of enforcement, the computation of the gross receipts from retail and nonretail selling will be based upon the semiannual record of sales of the establishment. The analysis of sales from January 1 to June 30 and July 1 to December 31 will be used to determine whether during each such 6-month period a substantial portion of the selling of the establishment was nonretail. If during such period the nonretail sales were not substantial, the establishment will be considered retail during that period. Conversely, if a substantial portion of the selling was nonretail, the establishment will not be considered retail for the period. If an establishment was retail for any such 6-month period, the fact that during certain workweeks a substantial portion of the sales of the establishment was nonretail will not alter the retail character of the establishment for those workweeks. On the other hand, if during any such 6-month period a substantial portion of the sales of the establishment was nonretail, the establishment will not be considered a retail establishment even during workweeks in the period in which the nonretail sales were not substantial.

20. For purposes of enforcement, the Administrator will recognize the following two principal exceptions to the 6-month test described in the preceding paragraph:

(1) Cases in which the 6-month analysis indicates that more than 25 percent of the selling of the establishment was nonretail, but such analysis *clearly* fails to present a picture which is representative of the selling of the establishment. To obviate the possibility of manifest distortions resulting from an inflexible application of the 6-month rule in these cases, the analysis will be extended back to cover an additional 6-month period. The gross receipts derived from sales for the full year will then be used to ascertain whether more than 25 percent of the total gross receipts was derived from nonretail sales.

(2) Cases in which the 6-month analysis clearly indicates that the basic character of the selling of the establishment changed at some particular point during the 6-month period. To insure the equitable application of the exemption in these cases, the determination will be made to correspond with the retail or nonretail character of the establishment will be made to correspond with the time of the change in the nature of the selling of the particular establishment.

21. The following specific examples illustrate these exceptions to the 6-month standard:

(1) An establishment is engaged in selling goods at retail. Its nonretail selling is unusual and sporadic and in the normal course of business the establishment would clearly qualify for exemption as a retail establishment under the 25-percent test. The semiannual record of sales of the establishment, however, reveals that on one or two occasions during the period the establishment was fortunate enough to make large and unexpected nonretail sales which are unlikely to recur. As a result of these extraordinary transactions the amount of gross receipts derived from nonretail sales is found to exceed 25 percent of the total gross receipts. Strict application of the 6-month standard would mean, of course, that the establishment could not be considered a retail establishment for the entire 6-month period. In view of the peculiar circumstances in this case, however, the initial 6-month analysis will be extended for an additional 6-month period and the determination will be based upon the selling record for the full year. In this manner the significance properly to be attached to the unusual nonretail sales will be reflected more accurately. If the sales record for the full year shows that more than 25 percent of the

total gross receipts was derived from nonretail sales, the establishment will not be considered a retail establishment. On the other hand, if such record for the year indicates that 25 percent or less of the gross receipts was derived from nonretail sales, the establishment will be considered retail for the entire year, notwithstanding the fact that for one of such 6-month periods the establishment would not have been retail under the 6-month standard. It should be noted, however, that this exception to the 6-month test is limited to unusual cases in which the application of the test patently does not present a typical picture of the selling of the establishment.

(2) An analysis of the record of sales of an establishment for the period January 1–June 30 indicates that between January 1 and April 1 the selling of the establishment was almost exclusively at retail. On April 1, however, the Federal Government began the construction of a large defense project in the vicinity. From that date, it appears from the records that nonretail sales to the Government comprise a substantial portion of the selling of the establishment. In this type of case, the analysis of sales from January 1 to June 30 may indicate that more than 25 percent of the gross receipts was derived from nonretail sales; hence, under the 6-month rule the establishment would not be considered a retail establishment for the *entire* period—including the period from January 1 to April 1. The Division, however, will not apply the 6-month rule here. The establishment will be considered a retail establishment until the time that the basic character of the establishment changed, and a nonretail establishment thereafter. Similarly, if the change in the selling of the establishment occurred at such time that for the period January 1 to June 30 it appeared that 25 percent or less of the gross receipts was derived from nonretail sales, the exemption will be considered inapplicable from the time the basic character of the establishment changed, even though the application of the 6-month rule would have led to the conclusion that the establishment was a retail establishment until June 30.

## SERVICE ESTABLISHMENTS

22. The term "service establishment" as used in section 13 (a) (2) may be considered to include generally that large miscellaneous assortment of business enterprises which are similar in character to retail establishments, but which may not be accurately classified as such.[19] Such an interpretation is suggested by the manner in which section 13 (a) (2) is drafted. Service and retail establishments are considered in the same sentence and the same criterion of intrastate commerce is made applicable to both.

23. Many of the characteristics outlined above with respect to retail establishments are helpful in determining whether a given establishment is a service establishment within the meaning of section 13 (a) (2). Service establishments are usually local in character, are usually open to the general consuming public and usually render a service to private individuals for direct consumption. The service is usually purchased in small quantities for private use rather than for industrial and business purposes. Further, the service is usually rendered at a "retail" price.

24. Typical examples of service establishments akin to retail establishments, within the meaning of the exemption are: Restaurants; cafeterias; roadside diners; hotels; tourist houses; trailer camps; home laundries; barber shops; beauty parlors; public baths; scalp-treatment establishments; masseur establishments; funeral homes; embalming establishments; crematories; establishments engaged in cleaning, dyeing, pressing, altering, and repairing hats, clothing, and household goods for private individuals; valet shops; shoe repair

[19] The language of the court in *Wood* v. *Central Sand and Gravel Co.*, 33 F. Supp. 40, supports this interpretation.

shops; shoeshine parlors; dress-suit rental establishments; public garages; automobile laundries; "drive it yourself" establishments; battery shops; parking lots; musical instrument repair shops; piano tuning establishments; radio repair shops; watch, clock, and jewelry repair establishments; household refrigerator service and repair shops. These establishments operate in the same manner as retail establishments and have substantially the same attributes. The principal difference is that their revenue is derived primarily from the sale of service instead of from the sale of merchandise.

25. From the foregoing, it is clear that service establishments generally repair consumer goods owned by the general consuming public. Public garages repair automobiles and tailor shops mend or repair clothing, etc. In some cases, however, an establishment repairs the type of goods which the general consuming public ordinarily does not own—building elevators, production machinery, commercial refrigerators, etc. Such establishments may not be considered as service establishments for purposes of section 13 (a) (2) for the same reasons that establishments engaged in *selling* goods which have only an industrial or business market are not retail establishments. An other example of an establishment which would not be a service establishment for the same reason is an industrial laundry or linen supply company which cleans or supplies coats, covers, towels, sheets, etc., for railroads, hotels, restaurants, beauty parlors, barber shops, stores, hospitals, and other industrial or business customers. Such an industrial laundry or linen supply company, unlike the home laundry which serves private individuals, does not stand in a position similar to that occupied by the retailer. It possesses attributes similar to those of the ordinary wholesaler (e. g., with respect to price, quantity, and type of customer) and may not be considered as a service establishment for purposes of the exemption.

26. Further, an establishment which is engaged in manufacturing (including manufacturing to special order) is not a service establishment for purposes of section 13 (a) (2) even though it also performs repair work for the general consuming public. Thus, for example, job printing establishments; dental laboratories which make plates, crowns, bridges, etc., to special order for dentists; and establishments engaged in printing newspapers are not service establishments within the meaning of the exemption.

27. As already indicated, establishments which perform a substantial amount of work for industrial or business users, government agencies, institutions, and similar customers may not be considered service establishments. A service establishment is one which performs service for private individuals for personal or family use. In some cases, however, establishments perform similar activities for business or industrial customers and for private individuals. For example, a cleaning establishment may clean garments used by industrial workers on their jobs as well as garments for private individuals. Normally, establishments cleaning the garments of private individuals constitute service establishments. The cleaning of garments such as uniforms worn by industrial workers will not alter the character of the establishment as a service establishment, if the work is performed at the normal price charged to private customers or if the transaction does not involve a quantity of goods materially larger than the normal quantity serviced for private customers.

28. The foregoing discussion indicates the principal attributes of a service establishment for purposes of section 13 (a)(2). Minor discrepancies, of course, will not defeat the exemption. Major variations from the pattern do indicate that the exemption is inapplicable. Thus, a laundry which cleans the garments of private individuals and also cleans linens and towels for business or industrial users (the latter work in large quantities and at a discount from the normal "retail" price), would still be considered a service establishment as long as the gross receipts from the linen and towel work were not substantial in relation to the total gross receipts of the establishment.[11]

29. Numerous letters have been received from banks (both commercial and savings); trust companies; building and loan associations; personal loan companies; insurance companies (life, fire, casualty, etc.—mutual, stock and fraternal benefit); insurance claim adjustment offices; title and abstract companies; establishments engaged in supplying business, financial, and statistical reporting data; newspapers; telephone companies; radio broadcasting stations; toll-bridge companies; water-supply companies; electric and gas utilities; stockbrokers; security dealers; factors; truck freight brokers, freight brokers, and customhouse brokers; booking agencies for actors and concert artists; printing and binding establishments; blue-print and photostat establishments; duplicating, addressing, mailing, and mailing-list establishments; press clipping bureaus; job-printing establishments; engraving concerns; advertising agencies, including billboard advertising; commercial art firms; investment counsel; adjustment and credit bureaus and collection agencies; credit-rating agencies; educational institutions; chambers of commerce; legal firms; accounting firms; engineering firms; firms engaged in making geological surveys; concerns engaged in compiling and distributing information to lawyers regarding new legal developments; employment agencies; court reporting establishments; parcel-delivery transportation firms; establishments engaged in arranging window displays; establishments engaged in renting public-address systems; sign-painting shops; armored-car companies; vending-machine establishments; companies engaged in renting construction equipment; companies engaged in supplying watchmen, guards, and detectives for industry; building contractors; warehouse companies; machine shops and foundries; auto wreckers and junk dealers; industrial blacksmiths; establishments engaged in sharpening and reconditioning industrial tools; establishments engaged in resistance welding; establishments engaged in armature rewinding; establishments engaged in making electric signs; concerns engaged in manufacturing awnings; tents, and similar products; companies engaged in the repair of business machines; companies engaged in repairing elevators; concerns engaged in performing tree surgery on the right-of-way of public utilities; drydock companies; companies engaged in contract oil-well drilling; dental laboratories and supply houses. Each asserts that it is engaged in rendering service. Although we recognize that the foregoing companies perform service, it is nevertheless our opinion that establishments engaged in such businesses are not in the ordinary case sufficiently similar in character to retail establish-

[11] See par. 18 above for a discussion of "substantial."

ments to be considered service establishments within the meaning of section 13 (a) (2).

30. In a broad sense every business performs service, yet no one would seriously urge that all types of businesses were eligible for exemption under section 13 (a) (2). It would be surprising indeed, if Congress had intended by the one word "service," as used in the phrase "retail or service establishment," to grant an exemption broad enough to include all of the above-mentioned classes of business, and there is nothing in the legislative history of section 13 (a) (2) to support such a conclusion.

31. In attempting to ascertain the scope of section 13 (a) (2) it is necessary to consider that section in relation to the other exemptions provided by section 13. The long list of specific exemptions set forth in section 13 manifests a studied effort on the part of Congress precisely to designate the classes of employees to be exempted by the statute. Accordingly, one should be cautious in attempting to stretch the provisions of section 13 (a) (2) so as to cover cases which were not patently intended to be included or which could have been designated easily and accurately in a specific exemption. Many of the foregoing types of business enterprise (e. g., banks, insurance companies, newspapers, utilities, etc.) could have been easily designated for specific exemption and that fact is another reason for our conclusion that such enterprises were not intended to be covered by general language which seems forced and artificial in its application to such cases.

32. In addition, it should be noted that the provisions of certain of the specific exemptions provided in section 13 buttress our opinion in respect of many of the foregoing classes of businesses. Thus, Congress apparently did not consider newspaper publishing houses to be service establishments within the meaning of section 13 (a) (2), since it was thought necessary to provide in section 13 (a) (8) a special limited exemption with respect to certain types of newspapers. Similarly, no one would dispute the fact that railroads perform a very valuable service to the country, yet it is clear from the provisions of section 13 (b) and section 15 (a) (1) that railroad companies were not considered service establishments within the meaning of section 13 (a) (2). Congress designated in section 13 (a) (9) certain special classes of utilities for specified exemption. If Congress had intended utilities in general to be considered as service establishments, there would, of course, have been no need for any such exemption. Section 13 (a) (11), enacted August 9, 1939, exempted switchboard operators employed in any public telephone exchange which has less than 500 stations. It would be difficult to rationalize the passage of such a special amendment if utilities as a whole were intended to be considered as service establishments.

## RETAIL OR SERVICE ESTABLISHMENT

33. A determination of the meaning of the word "establishment" in section 13 (a) (2) is necessary not only in order to decide whether an enterprise, or portion thereof, is within the exemption but also to ascertain whether the provision of the exemption, requiring that the greater part of the selling or servicing of an establishment be in intrastate commerce, has been satisfied. The word "establishment"

# ADDENDUM  C

Chapter 21

RETAIL OR SERVICE ESTABLISHMENT EXEMPTIONS FROM SECS 6 AND 7

Table of Contents

**21a    RETAIL OR SERVICE ESTABLISHMENT EXEMPTIONS - GENERAL**

21a00    General provisions.
21a01    Application of Sec 13(a)(2).
21a02    Employees "employed by" a new retail or service establishment before it opens for business.
21a03    Use of FOH Chapter 21 and IB 779.
21a04    Exemption effect on FLSA CL and R/K requirements.
21a06    Employees employed in the work of more than one establishment of the same employer.
21a07    Incidental processing and servicing distinguished from manufacturing.
21a08    Establishments engaged in making sales through outside salesmen.
21a09    Establishment located on instrumentalities or facilities of commerce.
21a10    Vending machine "establishments".

**21b    ESTABLISHMENT DETERMINATIONS**

21b00    Establishment--single concession.
21b01    Establishment--multiple concessions.
21b02    Casinos in hotels.
21b03    "Open to the public".

**21c    SPECIFIC APPLICATIONS - RETAIL CONCEPT AND SALES CRITERIA**

21c00    Purpose and use.
21ca00    Advertising distribution.
21ca01    Airport limousine service.
21ca02    Airports - aviation sales and services.
21ca03    Auto, truck, and trailer rental.
21ca04    Auto repairs.
21ca05    Ambulance services.
21ca06    Apartment houses.
21ca07    Auto license plate sales by retail establishments.
21cb00    Baby chicks.
21cb01    Boatyards.
21cb02    Beauty preparations and cosmetics.
21cc00    Contract mail hauling.
21cc01    Contract post offices.
21cc02    Concrete blocks and flues.
21cd01    Driving schools.

Case: 13-3818    Document: 32    Filed: 07/17/2014    Pages: 56

**21cg02** Gasoline sales to truckers.

Sales of gasoline at the ordinary gasoline service establishment (not a truck stop) by the "tankful" to truckers for use in the operation of the vehicle are generally recognized as retail sales notwithstanding that discounts such as 2 cents per gallon are allowed or that the sales are made on a credit card basis. (See also IB 779.371(c)(6).)

**21cg03** Civic and convention centers.

(a) Civic and convention centers whether publicly or privately owned or operated are normally engaged primarily in the business of renting space to business and civic organizations attracted to the locality. In order to attract conventions such centers "sell" their capability to "house" business meetings, trade shows, auto and boat shows, open-air exhibitions and mass meetings, including the directly related ancillary capabilities, i.e., parking lot, recreation, eating facilities, etc. Such rental of space to business and civic organizations constitutes a business activity lacking the retail concept. (See also FOH 21ca06.)

(b) The fact that independent contractors are engaged to cater food and beverages to the various groups and participants in activities held at the Centers does not alter the nonretail character of the Centers. Also, the fact that certain exemptions (e.g., Sec 13(a)(2), 13(b)(8), or 14) may be applicable to employees of such independent contractors, depending upon circumstances and character of the contractor's business, does not affect the applicability of the Act to employees of the Center.

**21ch00** Hotels, motels, and restaurants - competitive bid sales.

In determining the application of the Sec 13(a)(2) exemption to hotels, motels, and restaurants, sales resulting from competitive bids are not considered characteristic of retail selling and are not generally recognized as retail. For example, certain contracts for furnishing meals and/or lodging to government employees or military personnel may be let on the basis of competitive bid procedures. (See IB 779.328(d).)

**21ci00** Industrial maintenance services.

An organization which cleans air ducts, elevator shafts, air conditioning equipment, ventilating systems, flues, stacks, and the like, and repairs and refills fire extinguishers, fireproofs drapes, decorations, show booths, and the like, and performs maintenance work almost entirely for commercial or industrial establishments is performing specialized services which the general consuming public does not ordinarily have occasion to use. The organization is not engaged in activities which are traditionally recognized as retail even though it may also sometimes sell goods or render services to the general consuming public.

**21cL00** Lumber and building materials sales to contractors or builders.

(a) The lumber and building materials determination (see IB 779.355) together with Sec 3(n) form the basis for determining which sales are not for resale and are recognized as retail in the industry. In applying the tests of the lumber and building materials determination and Sec 3(n) to sales of materials to contractors or builders it is necessary to take into consideration, also, the general principles contained in IB 779.327 - 779.329, 779.335, and 779.336 which relate to retail and wholesale sales in general and sales for resale.

# ADDENDUM  D

JUL   2 1992

This is in reply to your letters concerning the application of
section 7(i) of the Fair Labor Standards Act (FLSA) to certain
employees employed by one of your clients, a corporation engaged
primarily in the business of selling, installing, maintaining and
monitoring of burglar, fire and other alarm systems.

You state that your client's alarm sales and installation forces
are located in business establishments in different geographic
locations throughout the country.  In the vast majority of cases,
the sales and installation employees are located in the same
office, but in some cities they are located separately.  Once a
sale is made, an installer is dispatched to install the alarm
system.   Though most sales are made by sales employees at
customers' premises in response to customers' requests, all of
your client's local establishments to which installation forces
are assigned are open to and accessible to the general public.

More than 70 percent of the total alarm systems sold by your
client are to residential customers.  In many of your client's
business establishments more than 75 percent of the total alarm
systems sold are to residential customers.  In other
establishments the percentage of total alarm systems sold to
residential customers is greater than 50 percent but less than 75
percent.

Your client wishes to create a new position known as
"commissioned installer."  The commissioned installers will be
compensated by paying them a percentage of the sales price of the
alarm systems they install.  It is envisioned that the
commissioned installer will be paid solely by commissions;
however, it is possible that the employees will occasionally be

paid hourly wages for a few days if the needs of the client's
business require that they work on large complex residential or
on commercial installations. Although your letter contains
considerable detail, there is not enough information for us to
make a definitive determination with regard to the application of
section 7(i) of the FLSA to your client's business. However, the
following information may be of assistance to you in making your
own determination.

The FLSA requires that all covered and nonexempt employees be
paid a minimum wage of not less than $4.25 an hour and overtime
pay of not less than one and one-half times their regular rates
of pay for all hours worked in excess of 40 in a workweek.
Section 7(i) of the FLSA provides an overtime pay exemption for
certain commission paid employees, if the employee is employed by
an establishment which meets the definition of a retail or
service establishment.  A retail or service establishment is
defined as an establishment 75 percent of whose annual dollar
volume of sales of goods or services is (1) not for resale and
(2) is recognized as retail sales in the industry.

In your situation where your client's enterprise consists of many
establishments, the annual dollar volume of each establishment
must be analyzed to determine if 75 percent or more of their
sales of goods or services is not for resale and is recognized as
retail sales in the industry. Any of your client's
establishments that do not meet this requirement cannot avail
itself of the section 7(i) exemption.

In this regard we would recognize as retail sales the sale of
alarm systems to residential customers and the sale of the
maintenance and monitoring services to such customers.  Also, we
would recognize as retail sales the sale of alarm systems to
commercial customers and the sale of the maintenance and
monitoring services to such customers, where the alarm systems
and maintenance and monitoring services are of the type normally
purchased by the general consuming public.  The sale of
specialized alarm systems to commercial customers which the
general consuming public would never or almost never purchase and
the sale of maintenance and monitoring services related to such
specialized alarm systems would not be recognized as retail sales

-3-

for purposes of section 7(i) of the FLSA.  Also, the sale and
installation of alarm systems in factories, wholesalers or other
nonretail businesses are nonretail sales, and the sale and
installation of such alarm systems in new construction is a
nonretail sale, since such a sale is a sale for resale.  Where
the commissioned installers work on complex residential or
commercial installations, such work may constitute construction
or reconstruction activities to which the retail concept has no
application.

In addition, we note that you indicate that in some cities the
sales and installation employees are located in separate
establishments.  This indicates to us that there are at least
some establishments where no retail sales take place.  Of course,
section 7(i) would have no application to employees employed by
these establishments.

Your client's commissioned installers who are employed by a bona
fide retail or service establishment may qualify for the overtime
pay exemption provided by section 7(i) if (1) the regular rate of
pay of such employee is in excess of one and one-half times the
minimum wage of $4.25 an hour, and (2) more than half the
employee's compensation for a representative period (not less
than one month) represents commissions on goods or services.

We trust that this satisfactorily responds to your inquiry.  If
you have any further questions please do not hesitate to contact
us.

Sincerely,


Daniel F. Sweeney
Deputy Assistant Administrator